**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANONE US, LLC,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>CHOBANI, LLC,<br><br>　　　　　　Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

## COMPLAINT

Plaintiff Danone US, LLC ("Danone US"), for its Complaint against Defendant Chobani, LLC ("Chobani"), respectfully alleges as follows.

## NATURE OF THE ACTION

1.　　Danone US, a leading food and beverage company, brings this action to put a stop to, and recover for, a deceptive naming, labeling, and advertising campaign by its competitor, Chobani.

2.　　Now more than ever, consumers are interested in maximizing their protein intake. In recent years, 20 grams of protein per serving has become a crucial threshold driving consumer purchase interest across a broad range of food and beverage categories—including yogurt.

3.　　Since 2021, Danone US has sold a line of yogurt products called Oikos Pro, marketed to consumers seeking to maximize per-serving protein consumption. All products in the Oikos Pro line meet or exceed the 20-grams-per-serving protein threshold.

4.　　Chobani saw the success Danone US enjoyed with Oikos Pro and set out to copy it. Instead of developing a product of comparable protein density, however, Chobani chose to engage in unfair competition and consumer deception.

5.      In 2024, Chobani introduced a line of yogurt products called "20G Protein" (the "Chobani Product").  Chobani acknowledged the importance of the 20-grams-per-serving protein threshold by using it in the Chobani Product's very name, and by featuring that claim prominently in the product's labeling and advertising.

6.      Chobani positions the Chobani Product as a direct competitor to Oikos Pro in the ultra-high-protein yogurt category (i.e., 20 grams or more per serving).  In reality, however, the Chobani Product is significantly less protein-dense than Oikos Pro.  Indeed, when comparing flavored versions of Oikos Pro and the Chobani Product, Oikos Pro contains about *26% more protein* ounce for ounce.  When comparing the plain varieties, the difference is as great as *39%*.  But Chobani hides this stark difference from consumers.

7.      Chobani sells the Chobani Product in both single-serving containers and multiple-serving containers or tubs.

8.      When it comes to single-serving containers, the U.S. Food and Drug Administration ("FDA") grants food manufacturers some discretion in determining the size of a "serving."  Nonetheless, the yogurt industry has long regarded 5.3 ounces as the standard size for a single-serving container of Greek-style yogurt.  For years, Chobani has sold (and still sells) its own flagship Greek yogurt product in single-serving units containing 5.3 ounces of yogurt.  Danone US sells its own single-serving yogurt products, including Oikos Pro, in 5.3-ounce containers.  So do other competitors, like FAGE, Ratio, Cabot, siggi's, and Wallaby.

9.      The problem for Chobani is that, while 5.3 ounces of Oikos Pro contains 20 grams of protein, 5.3 ounces of the Chobani Product falls well short of that critical threshold.  Chobani therefore designed its single-serving containers of the Chobani Product to hold 6.7 ounces of yogurt—more than the industry standard of 5.3 ounces, but just enough to provide 20 grams of

protein.  That conduct is not the focus of this lawsuit—although it does highlight the importance of the 20-grams-per-serving threshold to consumer purchase decisions.

10.    When it comes to multiple-serving tubs, however, Chobani engages in outright misrepresentation and blatantly violates FDA regulations.

11.    Unlike single-serving containers, multiple-serving containers are subject to strict FDA rules governing calculation of serving sizes.

12.    If Chobani followed FDA's serving-size rules for multiple-serving containers, the multiple-serving Chobani Product would be able to claim only *18 grams* of protein per serving— well below the critical 20-gram threshold.  To justify the "20 grams" claim in its product's name, labeling, and advertising, Chobani significantly inflates the size of each "serving" of the Chobani Product.  Here, however—unlike in the single-serving context—Chobani does not actually increase the amount of yogurt in the container.  And unlike in the single-serving context, this conduct is flatly prohibited by FDA regulations.

13.    Chobani engages in this conduct with full knowledge that consumers want to consume more protein, but have substantial "gaps" in nutrition understanding—such that they are likely to be fooled by Chobani's ploy.  In fact, according to Chobani's own research, 85% of consumers "want[] to increase their protein intake," and 74% of consumers "prioritiz[e] . . . [the] amount of protein . . . per serving" when selecting foods—even though a quarter of consumers "admit[] they don't know the right amount" of protein to consume.[1]

---

[1] Chobani, *Americans Are Prioritizing Protein Now More Than Ever, but Study Shows Significant Gaps in Nutrition Knowledge* (Dec. 4, 2024), https://www.chobani.com/newsroom/our-news/americans-are-prioritizing-protein-now-more-than-ever-but-study-shows-significant-gaps-in-nutrition-knowledge.

14.     If the Chobani Product were truthfully named, labeled, and marketed, consumers would not see it as a viable alternative to Oikos Pro in the ultra-high-protein yogurt category. However, Chobani's deceptive conduct makes consumers perceive it as a legitimate alternative in that category—thereby siphoning away protein-conscious customers who would otherwise have purchased Oikos Pro.

15.     If it were truthfully named, labeled, and marketed, the Chobani Product's closest comparator with respect to protein density would not be Oikos Pro, but Oikos Triple Zero—a different Danone US yogurt product that offers 15 to 18 grams of protein per serving (depending on variety) and costs significantly less than both the Chobani Product and Oikos Pro. Thus, if consumers knew the truth, instead of choosing the Chobani Product, they would choose either Oikos Pro for a true ultra-high-protein option, or Oikos Triple Zero for a better price.

16.     Manufacturing dairy products with 20 or more grams of protein per serving is difficult and costly. It requires state-of-the-art technology, customized production facilities, and innovative recipes. Danone US, which has been focused on applying scientific expertise to the craft of yogurt-making for generations, has made those investments. Chobani has not. To make up for this shortcoming in technology and know-how, Chobani has relied on consumer deception to elbow its way into the ultra-high-protein yogurt market.

17.     Chobani's deceptive naming, labeling, and advertising has caused—and, unless curtailed, will continue to cause—substantial harm to Danone US and to unwitting consumers. By this action, Danone US seeks injunctive relief, damages, corrective advertising, and disgorgement of Chobani's ill-gotten profits obtained through its deceptive and unlawful conduct.

**THE PARTIES**

18.      Plaintiff Danone US is a limited liability company organized under Delaware law with its headquarters at 1 Maple Avenue, White Plains, New York 10605.  Danone US markets and sells a variety of food and beverage products in New York, California, and throughout the United States.

19.      Since its founding in 1942 (as Dannon Milk Products, Inc.), Danone US has grown from a small yogurt business in the Bronx, New York, to a national leader in the categories of yogurt, organic foods and beverages, and plant-based foods and beverages.

20.      Research and innovation have long been at the heart of Danone US's business. Danone US's Louisville, Colorado Research and Innovation Center houses state-of-the-art research and development capabilities, as well as numerous food science, nutrition, and consumer insights experts.  Danone US also has access to the Daniel Carasso International Research Center, which is home to world-class researchers in life sciences, fermentation and intestinal microbiota, nutrition, and health, as well as experts in consumer experience and social sciences, and specialists in product design, packaging, and pilot-scale production.

21.      Defendant Chobani is a limited liability company organized under Delaware law with its global headquarters at 200 Lafayette Street, New York, New York 10013.  Chobani markets and sells yogurt, oat milk, and dairy creamers in New York, California, and throughout the United States.

22.      Danone US and Chobani are the top two yogurt makers, measured by sales revenue, in the U.S. market.  Danone US and Chobani compete vigorously for sales and share of this important sector of the food and beverage industry.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because the complaint asserts a claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  This Court has supplemental jurisdiction over Danone US's state-law claims pursuant to 28 U.S.C. § 1367(a).

24.    This Court has personal jurisdiction over Chobani because its global business headquarters is located in this District.  Chobani also committed many of the acts that form the basis of Danone US's claims—including the design, application, and dissemination of its deceptive labeling and advertising—in New York and in this District.  Chobani regularly and systematically transacts business in New York, including through the sale, distribution, and advertisement of its products.   Moreover, Chobani's deceptive conduct harms Danone US, which also has its headquarters in this District.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

**A.    The High-Protein Dairy Market**

26.    The food and beverage industry is undergoing a transformational change. Consumers have "proteinmania,"[2] with analysts calling demand for dietary protein the "trend of the decade."[3]  The percentage of Americans trying to consume protein has reportedly increased

---

[2]  Da Eun Kim et al., *Added Protein, Added Value? Consumer Demand for Protein Labels Across Product Types, Flavors, and Consumer Segments*, 139 Food Quality & Preference, May 2026, at 1.

[3]  Julian Mellentin, *Dairy Protein Is the Trend of the Decade*, Arla Foods Ingredients, https://www.arlafoodsingredients.com/the-whey-and-protein-blog/trends/dairy-protein-trend-of-the-decade/.

from 59% in 2022, to 70% in 2025, and now to 75% as of late February 2026.[4]  A "high protein" diet is the most common diet that Americans follow, and consumers use "good source of protein" as the top criterion to define a healthy food.[5]

27.    This ballooning demand is fostered in part by the rapid adoption of GLP-1 drugs for weight loss or disease management.  As of late 2025, approximately 1 in 8 U.S. adults is taking a GLP-1 drug, and this number is projected to rise.[6]  These medications reduce appetite, so consumers are reaching for nutrient-dense foods that deliver more nutrition in smaller portions.[7] As one healthcare provider put it, "if you're only able to eat 50% [of what you normally would], you should make every bite as nutritious as possible."[8]  Providers instruct patients to "prioritize protein" when taking the drugs.[9]  High-protein diets enable patients to maintain and build muscle during weight loss.

---

[4] *Americans' Perceptions of Protein*, Int'l Food Information Council (July 2025), https://ific.org/wp-content/uploads/2025/07/IFIC-Spotlight-Survey-Protein-Perceptions.pdf; Libby Hargreaves, *High-Protein Yoghurt: Danone's Supply Chain Answer to GLP-1*, SupplyChainDigital (Feb. 20, 2026), https://supplychaindigital.com/news/protein-yoghurt-danone-supply-chain-answer-glp-1.

[5] *Americans' Perceptions of Protein*, *supra*.

[6] News Release, KFF.org, Poll:  1 in 8 Adults Say They Are Currently Taking a GLP-1 Drug for Weight Loss, Diabetes or Another Condition, Even as Half Say the Drugs Are Difficult to Afford (Nov. 14, 2025), https://www.kff.org/public-opinion/poll-1-in-8-adults-say-they-are-currently-taking-a-glp-1-drug-for-weight-loss-diabetes-or-another-condition-even-as-half-say-the-drugs-are-difficult-to-afford/.

[7] Emily Wenerstrom, *High-Protein Trend Strengthens Dairy Market*, Food Bus. News (Mar. 20, 2026), https://www.foodbusinessnews.net/articles/30026-high-protein-trend-strengthens-dairy-market.

[8] Todd Neff, *Many People Using GLP-1 Weight Loss Drugs May Not Be Eating Enough Nutritious Food*, UCHealth (May 19, 2025), https://www.uchealth.org/today/nutrition-vital-when-taking-glp-1-weight-loss-drugs/.

[9] *Id.*

28.    Significant policy changes are driving increased protein demand, too.  In January 2026, the U.S. Departments of Health and Human Services and Agriculture released the *Dietary Guidelines for Americans* for 2025–2030.[10]  The updated Guidelines materially shifted the recommended macronutrient composition of their daily calorie intake.  In particular, the Guidelines recommend increasing protein intake by 50 to 100%, depending on body weight, without also increasing calories.[11]  That change in guidance has increased demand for foods that are high in protein yet relatively low in calories.

29.    At the supermarket, consumers chiefly evaluate a food's protein content by consulting the number of grams of protein that are present in a single serving.[12]  As noted above, Chobani's own research confirms that 74% of consumers "prioritiz[e] . . . [the] amount of protein . . . per serving" when selecting foods.[13]

---

[10] U.S. Dep't of Health & Hum. Servs. & U.S. Dep't of Agriculture, *Dietary Guidelines for Americans, 2025–2030*, https://cdn.realfood.gov/DGA.pdf.

[11] Andrea Alexander*, What You Need to Know About the New Dietary Guidelines*, Rutgers (Jan. 22, 2026), https://www.rutgers.edu/news/what-you-need-know-about-new-dietary-guidelines.

[12] *Americans' Perceptions of Protein*, *supra*.

[13] *Americans Are Prioritizing Protein Now More Than Ever*, *supra*.

30.     Twenty grams of protein per serving has emerged globally as a crucial consumer baseline for protein content.[14]  Consumer demand for at least 20 grams of protein per serving is reflected throughout the supermarket, including in the dairy aisle, with Danone US, Chobani, and other companies offering products from macaroni and cheese to toaster pastries that explicitly reference that threshold.



**Figure 1.**  *Examples of foods and beverages touting 20 grams of protein per serving*

31.     Protein content also drives greater spending.  Products with a high-protein label claim can command a price premium up to 12%.[15]

---

[14] Hargreaves, *supra*; *see* Lauren Sabetta, *Protein Flexes Its Muscles as Consumers Look to Add More Protein to Diet*, Beverage Indus. (Oct. 22, 2024) ("In the beverage space, 20 grams of protein is now a common threshold . . . [for] a single serving."), https://www.bevindustry.com/articles/97003-protein-flexes-its-muscles-as-consumers-look-to-add-more-protein-to-diet.

[15] Corey Geiger et al., *Dairy Poised to Help Meet Consumers' Growing Demand for Protein*, Cobank (Jan. 23, 2026), https://www.cobank.com/web/cobank/knowledge-exchange/dairy/dairy-poised-to-help-meet-consumers-growing-demand-for-protein (citing Circana market research).

32.    These dynamics have shifted market patterns across the food and beverage industry—particularly in the dairy sector.  From 2021 to 2024, yogurt sales increased by 28%.[16] This growth has been even more pronounced for products with high dairy-protein content: U.S. supermarket sales of such products grew by 17% in 2024 alone.[17]

33.    Chobani is keenly aware of this rising consumer demand, as well as the related gaps in consumer understanding.  As noted above, in December 2024, Chobani released survey results showing that, while 85% of Americans "are prioritizing protein now more than ever," they also "lack knowledge" around protein consumption and face multiple "barriers to entry."[18]  Chobani therefore knows that, when it comes to protein, consumers rely on brands to make truthful, nondeceptive claims to enable them to make the right purchase decisions.

**B.    The Relevant Products**

34.    Danone US's longstanding investment in science positioned it to innovate to meet its customers' emerging protein preferences, needs, and expectations.

35.    In particular, Danone US has developed and deployed specialized technologies, facilities, and expertise to (inter alia) remove water and lactose from milk and to concentrate casein and whey proteins.[19]  This investment has enabled Danone US to manufacture dairy products that meet or exceed the critical 20-gram threshold.

---

[16]  Corey Geiger et al., *Dairy Products Have More Growth Potential*, Cobank (July 2024), https://www.cobank.com/documents/7714906/7715329/KED-Report-DairyCPG-Jul2024.pdf/.

[17]  Mellentin, *supra*.

[18]  *Americans Are Prioritizing Protein Now More Than Ever*, *supra*.

[19]  Hargreaves, *supra*.

36.    For example, in August 2025, Danone US announced a $138 million investment in its Minster, Ohio yogurt production facility to make particular improvements to address consumer demand for nutrient-dense foods that are higher in protein.[20]

37.    Danone US began marketing higher-protein products long before "proteinmania" seized the market.  In 2015, Danone US launched Oikos Triple Zero, a Greek yogurt with 15 or more grams of protein per serving.

38.    As consumer interest in protein grew, so did Danone US's investment in this area. In 2021, Danone US announced its Oikos Pro product line.  The flagship product, Oikos Pro, offers 20 or more grams of high-quality protein per serving and comes in 5.3-ounce single-serving containers and 32-ounce multiple-serving tubs.

---

[20] *Id.*; *see* Press Release, Danone US, Danone US Invests into America's Heartland, Creating 30 New Full-Time Jobs Through Minster, Ohio Yogurt Plant Expansion (Aug. 25, 2025), https://www.danonenorthamerica.com/content/corp/noram/dna/us/en/newsroom/details.danone-invests-into-americas-heartland.html.



*Figure 2.  Oikos Pro 5.3-ounce and 32-ounce containers*

39.    The 5.3-ounce single-serving container is sold in a variety of flavors.  The 32-ounce multi-serving tub of Oikos Pro is available in plain and vanilla flavors.

40.    The directly competing Chobani Product, launched in October 2024, is called "Chobani 20G Protein."  On information and belief, Chobani designed, named, and marketed the Chobani Product with the specific intent to position it as a competitor to Oikos Pro in the ultra-high-protein (20 or more grams per serving) product category.

41.    As noted above, the Chobani Product is sold in both 6.7-ounce single-serving containers and 32-ounce multiple-serving tubs.  The single-serving container comes in a variety of flavors, while the 32-ounce tub is available in plain and vanilla flavors.

12

 

*Figure 3. Chobani 6.7-ounce and 32-ounce containers*

42.    On information and belief, Chobani did not make the investments in technology, facilities, and know-how needed to manufacture a true ultra-high-protein yogurt product like Oikos Pro.  Indeed, Chobani claims to manufacture the Chobani Product using a "generations-old authentic straining method."[21]  While there is nothing inherently wrong with traditional methods, they do not and cannot produce a yogurt with the protein density of Oikos Pro.

43.    Given an equal volume of both products, Oikos Pro vanilla contains about ***26% more protein*** than the vanilla Chobani Product.  Specifically, Oikos Pro vanilla has approximately 3.77 grams of protein per ounce of yogurt, and the vanilla Chobani Product claims to have approximately 2.99 grams of protein per ounce of yogurt.  This means that a consumer would need to eat a significantly greater volume of the Chobani Product than of Oikos Pro to consume the same amount of protein.

---

[21]  Video posted by Chobani (@Chobani), Instagram, *How We Craft Our High Protein* (Feb. 9, 2026), https://www.instagram.com/reel/DUjZEMkjmON/.

44.     When it comes to the plain variety, the difference is even greater: Oikos Pro plain has *39% more protein* than the plain Chobani product on an ounce-for-ounce basis.  This is because Oikos Pro plain is even more protein-dense than Oikos Pro's flavored varieties, providing 4.17 grams of protein per ounce of yogurt.  The Chobani Product, by contrast, claims to have the same protein density—just 2.99 grams per ounce—regardless of flavor.

45.     On information and belief, Chobani has tried and failed to manufacture dairy products that could legitimately compete in the ultra-high-protein category.  In February 2022, Chobani launched its "Ultra-Filtered Milk" product, which touted "20G Protein" on the front label.[22]  It discontinued that product just three months later,[23] following consumer feedback that the milk was "horrible," "thick," "syrupy," "sour," and like "goo."

## C.     Regulatory Background

46.     Since 1993, regulations promulgated by FDA have provided a standardized basis for determining serving sizes on product labels—and, accordingly, the denominators for per-serving nutrient-content claims.

47.     At the time it enacted these regulations, FDA recognized that standardization of serving sizes was necessary to "reduce [consumer] confusion"[24] and ensure that food label claims "are not misleading to consumers."[25]  According to the House Report that prompted these

---

[22]  Press Release, Chobani, LLC, Chobani Adds Two New Dairy Platforms with Launch of Chobani® Ultra-Filtered Milk and Chobani® Half & Half (Feb. 3, 2022), https://www.prnewswire.com/news-releases/chobani-adds-two-new-dairy-platforms-with-launch-of-chobani-ultra-filtered-milk-and-chobani-half--half-301474508.html.

[23]  Elaine Watson, *Chobani Discontinues Ultra-Filtered Milk Three Months After Launch*, FoodNavigatorUSA (Apr. 26, 2022), https://www.foodnavigator-usa.com/Article/2022/04/26/Chobani-discontinues-ultra-filtered-milk-three-months-after-launch/.

[24]  58 Fed. Reg. 2235–36 (Jan. 7, 1993).

[25]  56 Fed. Reg. 60421-01 (Nov. 27, 1991).

regulations, the non-standardized serving-size information previously provided by manufacturers was "extremely misleading," since consumers had no objective way to compare different products and determine which one was actually more nutrient-dense.[26]  FDA's goal in adopting these regulations was to ensure that nutrition claims "were the result of the characteristics of the food and *not* of manipulation of the serving size."[27]

48.    To implement serving-size standardization, FDA determined "reference amounts customarily consumed" ("RACC") for numerous foods, which signify the amount of a given food typically eaten in one sitting.  For yogurt, the RACC is 170 grams.[28]  Notably, the RACC is *not* the same thing as the serving size—but it does play a critical role in calculating serving sizes.

49.    Under FDA regulations, the serving size that must be declared for a given product depends on whether the product is packaged in a single-serving container or a multiple-serving container—which, in turn, depends on the RACC.  This system affords manufacturers "relatively little discretion" in determining serving sizes, especially for multiple-serving containers.[29]

---

[26]  58 Fed. Reg. 2235–36 (quoting H. Rep. 101-538, 101st. Cong., 2d sess. 18 (1990)).

[27] 56 Fed. Reg. 60421-01 (emphasis added).

[28]  21 C.F.R. § 101.12.  The 170 gram RACC for yogurt was set in May 2016.  *See* 81 Fed. Reg. 34000–01 (May 27, 2016).  This RACC for "yogurt" applies to all relevant products—the Chobani Product, Oikos Pro, and Oikos Triple Zero—even though each of them differs to some extent from traditional yogurt (e.g., because of straining or ultrafiltration).  FDA has directed that the "product categor[ies]" in its RACC regulation encompass products with "similar dietary usage," and that "substitute[s]" or "altered versions" of products specified in the RACC regulation "must [use] the same [RACC] as that of the regular counterpart food."  56 Fed. Reg. 60394-01, 1991 WL 250814 (Nov. 27, 1991); 21 C.F.R. § 101.12(d).

[29]  58 Fed. Reg. 2230.

50.     If a product is packaged and sold individually, and contains less than 200% of the applicable RACC, the declared serving size must be the contents of the entire container.[30] Stated otherwise, containers with less than 200% of the applicable RACC are deemed to be single-serving containers, and the serving size is simply whatever the container holds.

51.     If a product contains 200% or more of the applicable RACC, it is deemed a multiple-serving container. The serving size for a multiple-serving container must be expressed in terms of the relevant "common household measure"— cups, tablespoons, etc.[31] For yogurt, that "common household measure" is the cup.[32]

52.     To determine the applicable serving size, manufacturers must take the relevant RACC (for yogurt, 170 grams) and determine how many cups that amount of yogurt equates to. If the resulting amount lies between two whole numbers, it must be rounded to the nearest ¼ cup or ⅓ cup (i.e., ¼, ⅓, ½, ⅔, ¾).[33] For example, if 170 grams of a particular yogurt product equates to exactly 0.72 cups, then the closest permitted increment is ¾ (0.75) cup, and the serving size must therefore be declared as ¾ cup.

53.     On the label of a multiple-serving product, the declared serving size (in cups) must be followed in parentheses by "the equivalent metric quantity" (in grams).[34] Importantly, this "equivalent metric quantity" is not the RACC itself; it is the rounded-off serving size (in cups)

---

[30] 21 C.F.R. § 101.9(b)(3), (6); *see* FDA, *Food Labeling: Serving Sizes of Foods That Can Reasonably Be Consumed at One Eating Occasion, Reference Amounts Customarily Consumed, Serving Size-Related Issues, Dual-Column Labeling, and Miscellaneous Topics: Guidance for Industry* (Dec. 2019), https://www.fda.gov/media/133699/download.

[31] 21 C.F.R. § 101.9(b)(5).

[32] *Id.* § 101.12 tbl.2.

[33] *Id.* § 101.9(b)(5)(i), (ix).

[34] *Id.* § 101.9(b)(7).

converted back to grams.[35]  The "equivalent metric quantity" should equal the RACC of 170 grams only if 170 grams of a given yogurt product happens to take up a volume (in cups) that is an exact multiple of ¼ or ⅓.  Otherwise, the "equivalent metric quantity" will differ from the 170-gram RACC because of rounding.[36]  FDA considers this "equivalent metric quantity" to be the "actual amount of product per serving" used to calculate per-serving nutrient amounts in a product's Nutrition Facts panel and in any front-of-package nutrient-content claims.[37]



*Figure 4.*  *FDA-mandated calculation process for multiple-serving containers*

### D.    Chobani's Deceptive Product Naming, Labeling, and Advertising

54.    Mindful of the market trends discussed above, Chobani has attempted to compete for the same consumers Danone US targets with its Oikos Pro products: those seeking at least 20 grams of protein per serving.  But, unlike Danone US, Chobani has not invested the time and money necessary to develop the technology and manufacturing capacity to produce a product with a protein content above that critical threshold.  Instead, Chobani has chosen to pass off a less protein-dense product as a more protein-dense one by manipulating its serving sizes.

---

[35] *Id.*

[36] 58 Fed. Reg. 2229–01, 2239 (noting that "the parenthetical [equivalent] metric measure" "may vary [across] brands" in the same product category due to differences in product composition, and therefore, may "differ" from the RACC itself); *id.* at 2278 (noting that "the parenthetical metric equivalents of the household measure of the same food may differ for different brands due to the differences in the products' size and shape," because the metric equivalent is not "[s]tandardiz[ed] [to] the reference amount").

[37] *Id.*

55.     Start with single-serving containers of the Chobani Product.  Those containers bear a protein-content claim so prominent that it is part of the product name itself and nearly the same size as the word "Chobani."  That claim touts 20 grams of protein—the precise threshold that is crucial to consumers.  Likewise, the product's Nutrition Facts panel states that it contains "20g" protein "per serving[]."



| Serving Size | 6.7oz |
| Calories | 140 |
| Serving Per Container | 1 |

| Amount per servings | %DV* |
| --- | --- |
| Total Fat 3g | 4% |
| Saturated Fat 2g | 10% |
| Trans Fat 0g | - |
| Cholesterol 20mg | 7% |
| Sodium 100mg | 4% |
| Total Carbohydrate 9g | 3% |
| Dietary Fiber 2g | 7% |
| Total Sugars 7g | - |
| Includes 0g Added Sugars | 0% |
| Protein 20g | 40% |

*Figure 5.*  *Chobani 20G Protein 6.7-ounce vanilla yogurt Nutrition Facts*

56.     That claim appears to be accurate when made for Chobani's single-serving product because of the size of the container.  Under the above-referenced FDA regulation, the declared serving size for a single-serving container (and the denominator for any per-serving nutrient-content claim) must be the contents of the full container.  Chobani's single-serving containers contain 6.7 ounces of yogurt—the precise amount necessary to provide 20 grams of protein in total.  Since the entire container is the "serving," the product indeed appears to contain 20 grams of protein per serving.

57.     The single-serving container of Oikos Pro also contains enough yogurt to provide 20 grams of protein.  However, because Oikos Pro is significantly more protein-dense than the Chobani Product, the single-serving container of Oikos Pro provides that amount of protein in just

5.3 ounces of product—compared to the 6.7 ounces that the Chobani Product requires to meet the 20-gram threshold.  Stated otherwise, consumers must eat 26% more (by volume) to reach 20 grams of protein with the single-serve Chobani Product than they must eat to reach that threshold with Oikos Pro.

58.    The 5.3-ounce container size that Danone US uses for Oikos Pro is the industry standard for single-serving Greek-style yogurt products.  Danone US uses that 5.3-ounce container size for all of its Greek-style yogurts—not just Oikos Pro, but also Oikos Triple Zero and Dannon Light + Fit Greek.  Chobani, too, uses that 5.3-ounce container size for its Greek-style yogurt products *other* than the Chobani Product.  And competitors like FAGE, Ratio, Cabot, siggi's and Wallaby also sell their single-serving Greek yogurt products in 5.3-ounce containers.

59.    On information and belief, Chobani departed from the industry standard and designed its single-serving container for the Chobani Product to contain 6.7 ounces specifically so that one "serving" would reach the critical 20-grams-per-serving protein threshold.  That underscores the importance of the 20-gram threshold to consumer purchase decisions.  Chobani's single-serving containers are not the subject of this lawsuit.  Again, FDA regulations permit manufacturers to select the size of their single-serving container in this way, as long as the container (and thus, the serving size) remains less than 200% of the applicable RACC—as is true here for both parties' products.

60.    When it comes to Chobani's multiple-serving containers, however, the story is very different.  Multiple-serving tubs of the Chobani Product contain 32 ounces of yogurt—the same as multiple-serving tubs of Oikos Pro.  This format, too, bears the prominent "20G Protein" claim as part of the Chobani Product's name, as well as a declaration of "20g" protein "per serving[]" in

the Nutrition Facts panel.  Here, however, this claim is based on a serving size that is false, misleading, and unlawfully calculated.

61.     To see why, a bit of arithmetic is required.  Chobani declares that ¾ (0.75) cup of the Chobani Product weighs 190 grams.  Accordingly, 170 grams of this product—the RACC for yogurt—equates to just 0.671 cups of product.



| Serving Size | 3/4 cup (190g) |
|---|---|
| Calories | 140 |
| Serving Per Container | About 5 |
| Amount per servings | %DV* |
| Total Fat 3g | 4% |
| Saturated Fat 2g | 10% |
| Trans Fat 0g | - |
| Cholesterol 20mg | 7% |
| Sodium 100mg | 4% |
| Total Carbohydrate 9g | 3% |
| Dietary Fiber 2g | 7% |
| Total Sugars 7g | - |
| Includes 0g Added Sugars | 0% |
| Protein 20g | 40% |

*Figure 6.*  *Chobani 20G Protein 32-ounce vanilla yogurt Nutrition Facts*

62.     For its multiple-serving container, Chobani should have, pursuant to the aforementioned FDA regulation, taken 0.671 cups and rounded it to the nearest multiple of ¼ or ⅓ cup to determine its declared serving size.  That nearest multiple is ⅔ (0.667) cup.  The correct serving size would therefore be ⅔ cup, and the "equivalent metric quantity" used to calculate per-serving nutrition facts and claims would be 168.9 grams.

63.     Using the correct ⅔ cup serving size and the correct "equivalent metric quantity" of 168.9 grams, the Chobani Product contains only 17.78 grams of protein per serving, which FDA regulations permit to be rounded to 18 grams on the product label.



*Figure 7. Standardized, FDA-mandated calculation process for 32-ounce
Chobani 20G Protein Vanilla Yogurt*

64.      However, contrary to this regulation, Chobani uses ¾ (0.75) cup for its serving size. That is ***not*** the closest multiple of ¼ or ⅓ for the Chobani product. Instead, it is improperly inflated. Chobani then uses that inflated serving size to calculate an incorrect "equivalent metric quantity" of 190 grams, as reflected on its label.

65.      In other words, Chobani overstates its FDA-mandated serving size, and the resulting "equivalent metric quantity," by approximately 12.5%. That means Chobani's per-serving nutrition facts and claims—including its protein-per-serving claim—are also overstated by about 12.5%.



*Figure 8. Chobani's misleading calculation process with wrongful acts in red*

66.      Chobani mislabels both the plain and vanilla-flavored varieties of the 32-ounce multiple-serving Chobani Product in the same manner.

67.      In reality, as discussed above, a given volume of vanilla Oikos Pro contains about ***26% more*** protein than the same volume of vanilla Chobani 20G. But a consumer in the dairy aisle would compare the stated per-serving protein numbers (23 grams for Oikos Pro, 20 grams for

21

Chobani) and think that Oikos Pro contains only *15%* more protein—almost half the actual percentage difference between the products.[38]

68.     As alleged above, 20 grams per serving is a well-established psychological anchor point for consumers interested in maximizing protein intake.  Accordingly, through its deceptive labeling, Chobani misleads consumers to think that the Chobani Product's protein density meets that threshold, when it does not.  Chobani knows that if it had lawfully calculated its serving size and nutritional values, it could truthfully label the multiple-serving container of the Chobani Product as containing only *18 grams* of protein per serving, below the important 20-gram threshold.  Chobani, moreover, could not use the product name "20G Protein" for the multiple-serving container of the Chobani Product.

69.     If Chobani correctly named and labeled the multiple-serving Chobani Product as containing just 18 grams of protein per serving, that product would not compete in the same ultra-high-protein market segment as Oikos Pro, which offers 23 grams of protein per serving in its multiple-serving format.  Consumers would not view the products as reasonable substitutes for one another, since they would fall on opposite sides of the 20-grams-per-serving dividing line.

70.     Rather, the Chobani Product would compete with Danone US's Oikos Triple Zero, a lower-cost Danone US yogurt product.  Like the Chobani Product, Oikos Triple Zero contains less than 20 grams of protein per serving in its 32-ounce multiple-serving format: 17 grams per serving, to be precise.  By falsely claiming to contain 20 grams of protein per serving, rather than

---

[38] Oikos Pro's plain variety has an even greater amount of protein per serving—25 grams—which equates to 4.17 grams of protein per ounce.  By contrast, Chobani claims the same amount of protein per serving (20 grams) regardless of flavor or format.  Accordingly, compared to the Chobani Product's protein-per-ounce figure referenced above (2.99 grams), Oikos Pro plain in fact has *39% more* protein—but Chobani's mislabeling makes consumers believe that Oikos Pro has just 25% more.

18 grams, the Chobani Product significantly overstates its protein density vis-à-vis Oikos Triple Zero, when in fact, the two products' protein densities are roughly equal.



*Figure 9.* *Oikos Triple Zero 32-ounce Vanilla Blended Greek Yogurt*

71.    As a result of Chobani's deceptive conduct, 32-ounce tubs of the Chobani Product are placed in grocery stores alongside 32-ounce tubs of Oikos Pro, Oikos Triple Zero, and other yogurt products that comply with FDA's serving-size regulations.  That placement creates a contextual inference that misleads consumers to believe that the products' protein claims are directly comparable, when in fact they are not.

72.    Chobani knows that shoppers engage in this precise type of comparison.  FDA has expressly recognized that serving sizes for multi-serving food products must be standardized so that consumers can "compare the nutritional value of foods that," like yogurts manufactured by different companies, "are used interchangeably in the diet."[39]

---

[39] 56 Fed. Reg. 60394-01.

73.    Consumers expect that competing food companies follow the same rules when making nutrition claims.  When a manufacturer touts the per-serving protein content of its multi-serving yogurt product, consumers understand and expect that there is a standardized serving size for multi-serving yogurt products that all manufacturers employ when making such claims, and that the brand calculated the amount of protein per serving based on that standard serving size.

74.    This is not merely Danone US's say-so.  Danone US recently commissioned a survey from a well-qualified expert survey vendor to test this proposition.  A total of 320 U.S. consumers who purchase yogurt and deem protein important to their purchase decisions were shown side-by-side images of the Chobani Product and Oikos Pro, both in 32-ounce multiple-serving containers.   They were then asked: "Based on the information you saw on the packages, which of the following statements best describes how you would expect the amount of protein per serving in these products is calculated?"  They were presented with these options:

(a)    There is a standardized serving size, and both brands calculate the amount of protein per serving based on that standard serving.

(b)    There is a standardized serving size, but only one brand calculates the amount of protein per serving based on that standard serving, while the other does not.

(c)    There is no standardized serving size.  Each brand can choose any serving size they wish.

(d)    I don't have an expectation about this / don't know.

Two-thirds of the survey respondents (66.6%) gave response (a): "There is a standardized serving size, and both brands calculate the amount of protein per serving based on that standard serving."

75.    This shows decisively that consumers who view the Chobani Product alongside Danone US's products in the marketplace expect that both manufacturers are playing by the same rules when calculating and making statements about per-serving protein content.   Chobani's wrongful conduct described above flouts those reasonable expectations.

24

76.     In addition to its deceptive and unlawful product naming and labeling, Chobani prominently advertises the Chobani Product as containing "20 grams of protein" per serving—further reinforcing the deception created by the product's name and label.

77.     For example, Chobani's website states that the Chobani Product is "packed with 20g of complete protein to help keep you full and focused."[40]

Chobani® High Protein Greek Yogurt is thick, creamy, and packed with 20g of complete protein to help keep you full and focused. Made with real fruit, only natural ingredients, and a boost of B12 to unlock natural energy—one spoonful at a time.

*Figure 10.*  *Chobani High Protein Greek Yogurt website*

78.     Chobani's online ads, available on YouTube and social media sites, prominently feature the "20 grams of protein" claim in their imagery and voiceovers.

79.     One Chobani Instagram post asks: "How do we naturally get 20g of protein in our High Protein Greek Yogurt . . . ?"  It answers that question by touting Chobani's "straining process," which purportedly "allows [Chobani] to concentrate the protein content," "resulting in more protein per serving."[41]

---

[40] *High Protein Greek Yogurt*, Chobani, https://www.chobani.com/innovation/highprotein greekyogurt.

[41] Video posted by Chobani (@Chobani), Instagram, *How Do We Naturally Get 20g of Protein in Our High Protein Greek Yogurt* (Feb. 27, 2026), https://www.instagram.com/reel/DVRIic 5kcGw/?igsh=aXlvZ2pzNTZ5cTRv.



**Figure 11.** *Chobani Instagram post*

80.    Chobani makes these "20 grams" claims not just for the Chobani Product *generally*, but also for the 32-ounce multiple-serving format *specifically*.[42]  For example, Chobani's website depicts the 32-ounce multiple-serving Chobani Product with the marketing claim "Feel full with 20g of protein," linked by an asterisk to the phrase "Per Serving":



**Figure 12.** *Chobani High Protein Greek Yogurt Lowfat Plain website*

---

[42] *Chobani High Protein Greek Yogurt Lowfat Plain*, Chobani, https://www.chobani.com/ products/yogurt/high-protein/lowfat-plain-20g-large-size-tub.

26

81.    Likewise, Chobani's Instagram and Facebook posts introducing the 32-ounce multi-serving version of the Chobani Product said: "Introducing a new way to love Chobani:  20G Vanilla Greek Yogurt now comes in a 32oz multi-serve tub, which is equal to about 5 of our single-serve cups."[43]



***Figure 13.***  *Chobani Instagram post*

82.    None of these websites, postings, or advertisements discloses that *only* the single-serving Chobani Product actually contains "20 grams" of protein per serving when calculated in the manner required by FDA regulations, or that the multiple-serving Chobani Product actually contains *just 17.78 grams* of protein per serving when properly calculated according to the standardized method that reasonable consumers expect.

**INJURY TO DANONE US AND THE PUBLIC**

83.    Chobani's deceptive product naming, labeling, and advertising with regard to the 32-ounce multi-serving Chobani Product is damaging to Danone US and to the public.  These misleading representations are designed to entice consumers to purchase the Chobani Product over Danone US's products, such as Oikos Pro and Oikos Triple Zero.  The natural, probable and

---

[43] *How Do We Naturally Get 20g of Protein in Our High Protein Greek Yogurt*, *supra*.

27

foreseeable—indeed, the *intended*—result of Chobani's wrongful conduct has been to cause confusion, deception, and mistake in the yogurt market.

84. Specifically, Chobani's misleading representations of its protein content convey the false message that the Chobani Product sold in 32-ounce multiple-serving tubs meets the crucial 20-gram-per-serving protein threshold, like Oikos Pro does—when in fact, it does not.

85. Because the cost to produce the Chobani Product using Chobani's traditional straining method is (on information and belief) less than the cost to produce true ultra-high-protein yogurt products using the latest technology and production methods, Chobani's deceptive labeling has allowed it to reap a substantial unjust profit.

86. Chobani's cost savings allow it to undercut Oikos Pro on price, inducing protein-conscious consumers who would otherwise buy Oikos Pro to purchase Chobani's lower-protein product instead. For example, at the time of this writing, Oikos Pro 32-ounce Vanilla is sold at Walmart for $7.64, or 23.9 cents per ounce. Chobani 20G Protein 32-ounce Vanilla Greek Yogurt is sold at Walmart for $6.77, or 21.2 cents per ounce. Accordingly, Chobani's conduct described above misleads consumers into thinking that both products meet the crucial 20-gram-per-serving protein benchmark, and that the Chobani Product does so for a better price than Oikos Pro. In reality, as noted above, only Oikos Pro meets that threshold.

87. If the multiple-serving Chobani Product were correctly labeled, consumers would not consider it as a true competitor to Oikos Pro in the ultra-high protein yogurt category. Instead, they would consider it alongside Danone US's Oikos Triple Zero, which contains a comparable amount of protein per serving (17 grams for Oikos Triple Zero, 18 grams for the Chobani Product), for a significantly lower price than the Chobani Product. At this time of this writing, Oikos Triple

28

Zero 32-ounce Vanilla Greek Yogurt is available at Walmart for $6.27, or 19.5 cents per ounce—50 cents less than the Chobani Product for the same sized container.

88.     Thus, if the multiple-serving Chobani Product were truthfully labeled, consumers would do one of two things.  If protein content were the key driver of their purchase decision, they would choose Oikos Pro instead, since it is the only one of these products that actually contains at least 20 grams of protein per serving in its multiple-serving format.  On the other hand, if price were the key driver, they would choose Oikos Triple Zero instead, since Oikos Triple Zero has essentially the same protein density as the Chobani Product, yet costs significantly less.  Either way, consumers would choose a Danone US product over the Chobani Product.

89.     Through this two-pronged deception, Chobani diverts from Danone US both consumers who prioritize protein content and consumers who prioritize price.  Chobani has thus prevented Danone US from earning profits on sales that it rightfully should have made, while unjustly enriching itself.

90.     Danone US has a strong commercial interest in preventing the further dissemination of Chobani's deceptive product naming, labeling, and advertising.  If Chobani's deceptive conduct continues, Danone US will continue to lose business and goodwill to Chobani, and will fail to attract new customers that it otherwise would have attracted in the absence of Chobani's claims.  That damage, once done, will be difficult to quantify or remediate.

91.     In addition to causing irreparable injury to Danone US, Chobani's deceptive product naming, labeling, and advertising harms the public.  Consumers rely on product names, labels, and advertisements—including per-serving nutrient content claims—to make educated purchasing decisions.  Chobani's product naming, labeling, and advertising have the purpose and effect of deceiving consumers and inducing them to purchase the overpriced Chobani Product—

29

instead of the higher-protein Oikos Pro product, or the less expensive Oikos Triple Zero product. This conduct is particularly insidious when Chobani knows that healthcare providers and the federal government are directing the public to choose foods that offer higher concentrations of protein to maintain their health.

**FIRST CLAIM FOR RELIEF**
(False Advertising in Violation of the Lanham Act)

92. Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein.

93. Through the misleading product naming, labeling, and advertising described herein, Chobani has deceptively represented the 32-ounce multiple-serving Chobani Product's true protein density. Chobani's naming, labeling, and advertising deceive consumers into believing that the Chobani Product is significantly higher in protein density than Oikos Triple Zero, and closer in protein density to Oikos Pro than it actually is. They also mislead consumers to believe that the Chobani Product meets the important 20-gram-per-serving protein threshold, when in fact it does not. Moreover, they create the false impression that Chobani calculates protein content according to a standardized method, when in fact it does not, in violation of consumer expectations.

94. Chobani's deceptive naming, labeling, and advertising have deceived, or have the tendency to deceive, a substantial portion of the intended audience about matters that are material to purchasing decisions.

95. Chobani's misleading statements are made in commercial advertising and promotion in interstate commerce.

96. By reason of the foregoing, Chobani's statements violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

30

97.     Danone US has suffered and will continue to suffer actual damages in an amount to be proven at trial and irreparable injuries as a proximate result of Chobani's wrongful acts.

98.     Pursuant to 15 U.S.C. § 1117(a), Danone US is entitled to the disgorgement of Chobani's profits from its unlawful conduct, as well as its costs and attorneys' fees.

99.     Pursuant to 15 U.S.C. § 1116, Danone US is also entitled to a permanent injunction enjoining Chobani from misleadingly naming, labeling, and advertising the Chobani Product as containing 20 grams of protein per serving.

## SECOND CLAIM FOR RELIEF
(Violation of New York General Business Law §§ 349–350)

100.    Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein

101.    Chobani's foregoing acts constitute deceptive business practices and false advertising in violation of Sections 349 and 350 of the New York General Business Law.

102.    Chobani's conduct deceives reasonable New York consumers about facts material to their purchase decisions.  Through the misleading product naming, labeling, and advertising described herein, Chobani has deceptively represented the 32-ounce multiple-serving Chobani Product's true protein density.  Chobani's naming, labeling, and advertising deceive consumers into believing that the Chobani Product is significantly higher in protein density than Oikos Triple Zero, and closer in protein density to Oikos Pro than it actually is.  They also mislead consumers to believe that the Chobani Product meets the important 20-gram-per-serving protein threshold, when in fact it does not.  Moreover, they create the false impression that Chobani calculates protein content according to a standardized method, when in fact it does not, in violation of consumer expectations.

103.    Danone US has suffered and will continue to suffer actual damages in an amount

to be proven at trial and irreparable injuries as a proximate result of Chobani's wrongful acts.

104.    Danone US has no adequate remedy at law to compensate it for the damage caused by, and that will continue to be caused by, Chobani's wrongful acts.

### THIRD CLAIM FOR RELIEF
(Common Law Unfair Competition)

105.    Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein.

106.    Chobani's foregoing acts constitute unfair competition under the common law of the State of New York.

107.    Chobani wrongfully positions the 32-ounce multiple-serving Chobani Product as an ultra-high-protein peer to Oikos Pro, confusing consumers and diverting sales from Danone US's products, including Oikos Pro and Oikos Triple Zero.  Chobani's misleading product naming, labeling, and advertising harms Danone US and will continue to harm Danone US as long as it continues.

108.    Chobani is aware of the misleading nature of its current product naming, labeling, and advertising.

109.    Chobani is acting in bad faith by continuing to disseminate its misleading product naming, labeling, and advertising, and by continuing to position its product alongside Oikos Pro despite this knowledge.

110.    Danone US has suffered and will continue to suffer actual damages in an amount to be proven at trial and irreparable injuries as a proximate result of Chobani's wrongful acts.

111.    Danone US has no adequate remedy at law to compensate it for the damage caused by, and that will continue to be caused by, Chobani's wrongful acts.

**FOURTH CLAIM FOR RELIEF**
(Unfair Conduct in Violation of the California Unfair Competition Law,
Cal. Bus. & Prof'l Code § 17200 *et seq.*)

112.   Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein.

113.   To induce the public to purchase the 32-ounce multiple-serving Chobani Product, Chobani has disseminated false and misleading statements about the Chobani Product within the State of California—including in its naming, labeling, and advertising.  Those statements have deceived, and will continue to deceive, reasonable consumers in California.

114.   Chobani knew or should have known by the exercise of reasonable care that its naming, labeling, and advertising were deceptive and misleading.

115.   Chobani's conduct alleged herein offends established public policies prohibiting the false and misleading naming, labeling, and advertising of food products, and the manipulation of serving sizes to frustrate meaningful nutrition comparisons among food products.  These public policies are expressed, *inter alia*, in California's Sherman Food and Drug Law, Cal. Health & Safety Code § 110100(a), and the regulations adopted thereunder.

116.    Chobani's conduct alleged herein is immoral, unethical, unscrupulous, and substantially injurious to consumers.  The harm these practices cause to California consumers outweighs any benefits associated with them.  That harm is not reasonably avoidable by consumers.

117.   As a direct and proximate result of the foregoing acts and practices, Chobani has received, or will receive, unjust profits that it would not have received if it had not engaged in the foregoing conduct.

118. Danone US lacks an adequate remedy at law. As a result of Chobani's foregoing conduct, Danone US has been damaged and will continue to be damaged. Danone US will continue to suffer injury to the goodwill of its Oikos brand and its business associated with the sale of Oikos Pro and Oikos Triple Zero products unless and until Chobani is enjoined from continuing its wrongful acts.

119. As a direct and proximate result of the foregoing acts and practices, Chobani has obtained an unfair competitive advantage over Danone US and others that have not engaged in such practices, and it will continue to maintain that unfair advantage unless equitable relief is granted.

**FIFTH CLAIM FOR RELIEF**
(Unlawful Acts or Practices in Violation of the California Unfair Competition Law,
Cal. Bus. & Prof'l Code § 17200 *et seq.*)

120. Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein.

121. California's Sherman Food and Drug Law, Cal. Health & Safety Code § 110100(a), provides that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal [Food, Drug, and Cosmetic] [A]ct, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state." Thus, California adopts all FDA food-labeling regulations by reference and independently requires compliance with them as a matter of state law.

122. Chobani's labeling of the 32-ounce multiple-serving Chobani Product violates the federal Food, Drug, and Cosmetic Act because it fails to comply with the applicable product category regulations. Specifically, as described above, Chobani's product is misbranded because the label misstates the true serving size and calculates per-serving protein content based on an

improper serving size, thereby making an improperly inflated per-serving protein content claim.

123.    Chobani's labeling of the 32-ounce multiple-serving Chobani Product violates California's Sherman Food and Drug Law because it fails to comply with applicable California product category regulations—namely, the aforementioned federal regulations, which are independently incorporated into California law as California's own regulations.

124.    Chobani's violation of the Sherman Food and Drug Law is an unlawful business practice under California's Unfair Competition Law, which makes privately actionable as "unfair competition" any act that violates any federal or state statute or regulation, including California's Sherman Food and Drug Law.

125.    Chobani knew or should have known by the exercise of reasonable care that its naming, labeling, and advertising were deceptive and misleading.

126.    As a direct and proximate result of the foregoing acts and practices, Chobani has received, or will receive, unjust profits that it would not have received if it had not engaged in the foregoing conduct.

127.    Danone US lacks an adequate remedy at law.  As a result of Chobani's foregoing conduct, Danone US has been damaged and will continue to be damaged.  Danone US will continue to suffer injury to the goodwill of its Oikos brand and its business associated with the sale of Oikos Pro and Oikos Triple Zero products unless and until Chobani is enjoined from continuing its wrongful acts.

128.    As a direct and proximate result of the foregoing acts and practices, Chobani has obtained an unfair competitive advantage over Danone US and others that have not engaged in such practices, and it will continue to maintain that unfair advantage unless equitable relief is granted.

**SIXTH CLAIM FOR RELIEF**
(Deceptive Conduct in Violation of the California Unfair Competition Law,
Cal. Bus. & Prof'l Code § 17200 *et seq.* and § 17500 *et seq.*)

129.    Paragraphs 1 through 91 of this Complaint are hereby repeated and realleged as if fully set forth herein.

130.    To induce the public to purchase the 32-ounce multiple-serving Chobani Product, Chobani has disseminated false and misleading statements about the Chobani Product within the State of California, including in the product's naming, labeling, and advertising.  Those statements have deceived, and will continue to deceive, reasonable consumers in California.

131.    Through the misleading product naming, labeling, and advertising described herein, Chobani has deceptively represented the Chobani Product's true protein density. Chobani's naming, labeling, and advertising deceive consumers into believing that the Chobani Product is significantly higher in protein density than Oikos Triple Zero, and closer in protein density to Oikos Pro than it actually is.  They also mislead consumers to believe that the multiple-serving Chobani Product meets the important 20-gram-per-serving protein threshold, when in fact it does not.  Moreover, they create the false impression that Chobani calculates protein content according to a standardized method, when in fact it does not, in violation of consumer expectations.

132.    Chobani knew or should have known by the exercise of reasonable care that its naming, labeling, and advertising were deceptive and misleading.

133.    As a direct and proximate result of the foregoing acts and practices, Chobani has received, or will receive, unjust profits that it would not have received if it had not engaged in the foregoing conduct.

134.    Danone US lacks an adequate remedy at law.  As a result of Chobani's foregoing conduct, Danone US has been damaged and will continue to be damaged.  Danone US will

continue to suffer injury to the goodwill of its Oikos brand and its business associated with the sale of Oikos Pro and Oikos Triple Zero products unless and until Chobani is enjoined from continuing its wrongful acts.

135.    As a direct and proximate result of the foregoing acts and practices, Chobani has obtained an unfair competitive advantage over Danone US and others that have not engaged in such practices, and it will continue to maintain that unfair advantage unless equitable relief is granted.

## **PRAYER FOR RELIEF**

WHEREFORE, Danone US demands judgment against Chobani as follows:

1.    An injunction that permanently bars Chobani from overstating the true per-serving protein content of the Chobani Product, including but not limited to by naming, labeling, advertising, or describing the 32-ounce multiple-serving Chobani Product with the name "20G Protein" or as containing "20g" or "20 grams" of protein per serving;

2.    An order requiring Chobani to disseminate, in a form approved by the Court, advertising designed to correct the erroneous impression created by Chobani's misleading product naming, labeling, and advertising;

3.    A judgment that Chobani violated 15 U.S.C. § 1115(a) by unfairly competing against Danone US by using deceptive or misleading advertising and promotion that misrepresents the nature, quality and characteristics of the Chobani Product;

4.    An award of Danone US's damages attributable to Chobani's deceptive naming, labeling, and advertising, in an amount to be determined at trial;

5.    Disgorgement of Chobani's profits from the sale of the deceptively named, labeled, and advertised products, pursuant to 15 U.S.C. § 1117;

6.    A declaration that this is an "exceptional case" due (among other things) to the willful nature of Chobani's deceptive conduct, and awarding treble damages, attorneys' fees and costs to Danone US pursuant to 15 U.S.C. § 1117;

7.    An order directing that all of Chobani's misleading and deceptive advertising and packaging be destroyed pursuant to 15 U.S.C. § 1118;

8.    An order pursuant to 15 U.S.C. § 1116(a) directing Chobani to file with the Court and serve upon Danone US, within 30 days after entry of judgment, a report, in writing and under oath, setting forth in detail the manner and form in which Chobani has complied with the judgment;

9.    A judgment that Chobani violated New York's GBL §§ 349–350 and California's UCL §§ 17200 *et seq.* and 17500 *et seq.* and awarding all relief available under those statutes, including but not limited to:

      a.    Statutory damages under N.Y. G.B.L. §§ 349–350,

      b.    Actual damages under N.Y. G.B.L. §§ 349–350, and

      c.    An injunction under N.Y. G.B.L. §§ 349–350 and UCL § 17200 *et seq.* that permanently bars Chobani from overstating the true per-serving protein content of the Chobani Product, including but not limited to by naming, labeling, advertising, or describing the multiple-serving Chobani Product with the name "20G Protein" or as containing "20g" or "20 grams" of protein per serving;

10.    A declaration that this action resulted in the enforcement of an important right affecting the public interest, and an award of attorneys' fees and costs to Danone US pursuant to Cal. Civ. P. Code § 1021.5;

11.    An order granting pre-judgment and post-judgment interest; and

38

12.     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Danone US hereby demands a trial by jury on all issues triable before a jury in this action.

Dated:  June 15, 2026

DANONE US, LLC
/s/  Steven A. Zalesin

Steven A. Zalesin
Jonah M. Knobler
Julia M. MacAllister
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel.: (212) 336-2000
sazalesin@pbwt.com
jknobler@pbwt.com
jmacallister@pbwt.com

*Attorneys for Danone US, LLC*